## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| FLYNN HANNERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  09-3111 |
| | ) | |
| LARRY TRENT, HAROLD NELSON, | ) | |
| LANCE ADAMS, RICH WOODS and | ) | |
| LEONARD STALLWORTH, | ) | |
| | ) | |
| Defendants. | ) | |

### OPINION

This matter comes before the Court on Defendants Larry Trent,
Harold "Skip" Nelson, Lance Adams, Rich Woods and Leonard Stallworth's
Motion for Summary Judgment (d/e 21).  For the reasons stated below, the
Motion for Summary Judgment is ALLOWED.

### FACTS[1]

**THE BARBIE DOLL E-MAIL**

On February 4, 2008, Plaintiff Flynn Hanners ("Hanners"), a master-
sergeant with the Illinois State Police ("ISP"), sent an e-mail to 16 ISP

---

[1]These facts are derived from pp. 4-58 of Plaintiff's Memorandum of Law in
Opposition to Summary Judgment (hereinafter "Hanners' Brief") (d/e 27).

employees using the ISP's e-mail system and an ISP computer.  The e-mail was entitled "Mattel recently announced the release of limited-edition Barbie Dolls for the Springfield market".

Hanners' e-mail included pictures of fictitious Barbie Dolls (the "Barbies") with various accessories and descriptions.  The Barbie Dolls included a "Chatham Barbie," and stated that the doll: was sold only at the Gables[2]; was available with or without a tummy tuck and fact lift; and that workaholic Ken was sold only in conjunction with the augmented version. The e-mail referred to a "Rochester Barbie," who was depicted as a homemaker who gets lost easily and has no full-time occupation.  There was also an "East Side Barbie," "recently paroled, [who] comes with a 9mm handgun, a Ray Lewis knife, a Chevy with dark tinted windows, and a Meth Lab kit.  Th[e] model is only available after dark and must be paid for in cash (preferably small untraceable bills), unless you are a cop, then we don't know what you are talking about."

Hanners' e-mail also included a "Panther Creek Barbie", described as a "yuppie" and comes with a BMW or Hummer.  According to the e-mail, "[t]his Barbie has her own Starbucks cup, credit card and country club

---

[2]The Gables is a Springfield, Illinois shopping center.

membership . . . available with this model are Shallow Ken and Private School Skipper." The e-mail stated that the "Panther Creek Barbie" model comes with credit card debt, car loans and three mortgages. Additionally, the e-mail referred to a "Riverton Barbie" who was depicted in front of a pick up truck, with a confederate flag and six pack of beer nearby. "Riverton Barbie" was said to wear Wrangler jeans "two sizes too small, a NASCAR t-shirt, and Tweety Bird tattoo on her shoulder." "Riverton Barbie" was said to be able to spit over 5 feet and "kick mullet-haired Ken's butt when she is drunk." Next, there was "Lake Area Barbie". She was said to be "collagen injected, botoxed, rhinoplastied," and wearing a leopard print outfit. She was purportedly available with a Percocet prescription. She had a live-in partner, Dr. Ken, and was available with a new prescription pad and "Skipper on the side."

"Pawnee Barbie" was depicted in the e-mail standing in front of a small trailer with one high heel on and one off and was described as "tobacco-chewing" and "brassy-haired". She was said to have "a pair of her own high-heeled sandals with one broken heel from the time she chased beer-gutted Ken out of Divernon Barbie's house." "Pawnee Barbie" allegedly came with "low-rise acid-washed jeans, fake fingernails, and a see-

through halter-top [and was] [a]lso available with a mobile home."

There was also a "Downtown Barbie" depicted as two dolls; one wearing a dress and long hair and one wearing less feminine clothing with her hair back. "Downtown Barbie" was described as having "long straight brown hair, arch-less feet, hairy armpits, no makeup, and Birkenstocks with white socks." "Downtown Barbie" did "not want or need a Ken doll, but if you purchase two Downtown Barbies and the optional Subaru wagon, you get a rainbow flag bumper sticker for free." Additionally, there was a "Leland Grove Barbie" characterized, in part, as coming with an old-money Springfield pedigree and small-mindedness. Lastly, Hanners' e-mail depicted a "South of Downtown Barbie/Ken" as a versatile doll that "can be easily converted from Barbie to Ken by simply adding or subtracting the multiple snap-on parts. He/She comes with his/her own bail bond card and criminal record for prostitution and possession. He/She had been banned from Walgreen's and CVS for attempting to purchase more than two boxes of ephedrine-containing drugs in one day.

Hanners' e-mail was received by ISP Special Agent Stacy Connor

("Connor")[3] on February 4, 2008, and she forwarded it to two other ISP employees. Connor also forwarded the e-mail to ISP Sergeant Brenda Burton ("Burton"). Though Burton was not offended by the e-mail, she felt she needed to bring it to the attention of her supervisor. Burton thought the e-mail might be a set-up to see how she would react as a supervisor who received correspondence of this nature on company equipment. Burton wrote a note to her supervisor, Master Sergeant John Lewis and attached a copy of the e-mail. Burton noted the e-mail was probably forwarded to her by mistake.

Hanners' e-mail was also received by Commander Rich Woods ("Woods"). Woods reviewed the e-mail and found it to be racist and sexist. He wanted to determine whether the e-mail had been sent on the ISP's e-mail system and from and ISP computer. Woods, thus, shared the e-mail with Captain Gordon Fidler ("Fidler").[4] Woods indicated that the e-mail should be investigated. Woods said there should be some further inquiries to determine whether the e-mail originated from Hanners.

---

[3]In the pleadings, this individual's last name is variously spelled "Connor" and "Conner". The Court will use the spelling "Connor".

[4]In the pleadings, this individual's name is variously spelled "Fiddler" and "Fidler". The Court will use the spelling "Fidler".

ISP's Division of Internal Investigation ("DII") was notified about the e-mail on April 3, 2008, and the incident was assigned Case #0870022. Captain Scott Rice, ISP's Zone 7 Commander, completed a Complaint Against Department Member ("CADM") form against Connor on April 21, 2008, in relation to the e-mail. The case was referred to ISP's Equal Employment Office ("EEO") on May 2, 2008.

The April 3, 2008, CADM stated that on March 27, 2008, Fidler was given copies of an e-mail sent from Hanners on his ISP-issued computer to several recipients within the ISP. The CADM also stated that:

> The e-mail depicts several Barbie dolls, each of which were supposed to represent various towns around Springfield. Each description of the doll based upon what some might suggest is a stereotype for that particular community. Commander Woods directed me to contact DII Acting Southern Commander Gerry Jenkins to determine the appropriate course of action. On 3/27/08, I met with A/Commander Jenkins and provided him with the material I had been given. He advised me DII would open and investigate this issue.

A File Initiation Report was also filled out regarding Hanners and the e-mail. DII referred the e-mail incident to Fidler. Fidler asked Hanners' supervisor, Lt. Sherry Anderson-Martin ("Anderson-Martin"), to investigate Hanners pursuant to the DII referral. Anderson-Martin interviewed Burton and Connor (two recipients of Hanners' e-mail). She also interviewed

6

Hanners and Hanners admitted sending the e-mail to Connor. Anderson-Martin wrote reports on the three interviews, made a recommendation and discussed it with Fidler. The investigation and recommendation was subsequently withdrawn from Fidler and Anderson-Martin and given back to DII.

Although Anderson-Martin did not speak with anyone from the EEO in the course of her investigation, at some point the EEO became involved in the investigation. Master Sergeant Robert Sgambelluri was assigned to conduct the investigation.

Suzanne Bond was the Chief of the EEO. Her office was responsible for overseeing internal EEO training, including employment law training and cultural diversity training. The EEO had an internal complaint process for EEO claims that included options for investigation and mediation. If an employee made a complaint, the employee would sign an EEO intake questionnaire and provide a narrative regarding what allegedly happened and explain why the actions constituted discrimination, harassment or retaliation.

In addition to being involved in the investigation of Hanners' e-mail, the EEO was investigating an ISP District Commander who sent all of the

other District Commanders an e-mail making fun of women. The e-mail contained a cartoon depicting a man and a woman in a car. The man had a traditional seat belt and the woman had a seatbelt that went across her lap, shoulder and mouth. Another e-mail under investigation by the EEO involved a situation where two individuals sent a link to a video concerning the appropriate use of the "F-word" (hereinafter the "'F-Word' video").

On May 28, 2008, prior to the completion of the Hanners' investigation, Bond e-mailed ISP Director Harold Nelson ("Nelson") and copied ISP Assistant Deputy Director Lance Adams ("Adams") regarding all of the e-mail investigations/issues, outlining the current investigations and giving them her opinion of possible charges and course of action. Bond indicated she had discussed her opinions with ISP legal counsel John Hosteny and Jessica Trame. Adams was copied because individuals other than Hanners were under his command.

During the Hanners' investigation, the EEO surveyed all recipients of his e-mail. No one said they were offended by the e-mail and no one wanted to make an EEO complaint.

Sgambelluri interviewed Hanners on August 18, 2008. Hanners initially stated that he believed the e-mail was not improper because he had

heard the content on the radio and if the FCC allowed the content, it was not inappropriate for the workplace.  However, at the time of his interview, Hanners acknowledged that sending the e-mail was an improper use of ISP e-mail.  Hanners also acknowledged receiving training on EEO policies. Sgambelluri concluded that "while the contents of the e-mail were related to race, sexual orientation, parental status, pregnancy, family responsibilities, and the characteristics of gender, no person receiving the e-mail reported being offended by its contents," and did not state it interfered with their work performance or created a "hostile, abusive or offensive work environment."  Therefore, Sgambelluri concluded the investigation did not substantiate a charge of hostile work environment as defined in ISP policy.

However, Sgambelluri did conclude that the e-mail "contained derogatory references to women, African Americans, and other categories of people, and presented negative and demeaning stereotypes of these groups." Thus, Sgambelluri determined that Hanners' transmission of the e-mail to others via ISP equipment and/or within the ISP workplace, was without a business reason and was contrary to ISP Policy PER-009.  ISP PER-009 stated that ISP "will ensure managers and supervisors recognize their responsibility for carrying out the spirit and intent of the EEO Program."

Sgambelluri determined that the investigation supported charging Hanners with violating Rules of Conduct-002, III.A.64: Violating PER-009, Equal Employment Opportunity, Level 4 Misconduct; and ROC-002, III.A.38: Misuse of ISP equipment, Level 1 Misconduct.

Bond agreed that the e-mail violated ISP policy. She recommended to ISP Director Larry Trent ("Trent") that Hanners be charged with violating Rules of Conduct (ROC)-002, III.38, "Officers will utilize Department equipment only for its intended purpose, in accordance with established Department procedures and will not abuse or damage Department equipment. Officers will use reasonable care to avoid loss of Department equipment. All Department equipment issued to officers will be maintained in proper order (Level I on the Matrix); and violation of ROC-002, III.A.64: Officers will not engage in conduct that is in violation of the policies and procedures established in directives PER-009, 'Equal Employment Opportunity,' PER-032, 'Discrimination and Harassment,' or PER-033, 'Sexual Harassment,' (Level 4 on Matrix)."

Bond's recommendation to Trent included a citation to PER-009, III.6.C.: "Colonels and their Supervisors and Managers will recognize their explicit responsibility for carrying out the spirit, as well as the intent, of the

EEO Program, including but not limited to the EEO Plan, and actively work to advance the program among the employees they supervise." Bond's recommendation to Trent also included recommendations for discipline for Special Agent Kinter (nee Connor) and Special Agent Rolape, and Trooper Mark Beagles (ISP personnel who disseminated the Barbie doll e-mail).

ISP's interim chief legal counsel and Trent reviewed the findings and Bond's recommendations. Trent determined that Hanners should be charged as Bond recommended. Trent forwarded his recommendations to Deputy Director of the Division Operations Harold Nelson ("Nelson"). Bond asked Nelson to"advise the EEO Office what actions you have taken in response to the charges identified above within 30 days of your receipt of this information."

## REACTION TO THE BARBIE DOLL E-MAIL

Commander Leonard Stallworth, one of Hanners' superiors, saw the Barbie Doll email and found it to be inappropriate. He could not believe that an ISP supervisor such as Hanners would send it out or think it was funny. As an African-American, Stallworth also found the e-mail to be racially offensive because the "North End Barbie" appeared to be African American and was depicted as being 16-yrs. old, with a baby carriage,

G.E.D., bus pass, LINK Card.  An available accessory to "North End Barbie" was "Gangsta Ken", but he and his 1979 Caddie were said to be difficult to find since the addition of the infant.  Stallworth believed the "North End Barbie" contained African-American stereotypes.  Stallworth believed the e-mail reflected poorly on the ISP and would cause people to question whether they could depend on the ISP.  In Stallworth's view, an e-mail like the one Hanners sent, speaks of the sender's beliefs and represents the ISP.  Sending such an e-mail can have a huge effect.  Thus, Hanners should have known better than to send it out over department e-mail.  Moreover, Stallworth believed the e-mail was problematic because the master sergeant's subordinates might, upon seeing their superior send the e-mail, believe such inappropriate things were permissible.  Stallworth was concerned that the ISP could be subjected to litigation and its reputation would suffer.

Like Stallworth, Adams[5] was offended by Hanners' e-mail because he believed it was inappropriate to stereotype individuals.  Adams thought the e-mail's depiction of an unwed teenage mother and the use of a confederate flag were offensive.  He also thought it was wrong to criticize or stereotype

---

[5]When Stallworth retired in March 2009, Adams became a superior in Hanners' chain of command.  Adams was part of Hanners' chain of command from March 2009 through June 2009.

individuals who have lived in multigenerational poverty through no fault of their own.

Similar to Adams and Stallworth, Nelson was offended by Hanners' Barbie Doll e-mail. Nelson, the EEO's former Coordinator,[6] believed the e-mail violated EEO policies because the pictures were racist and sexist. Specifically, Nelson believed the "East Side Barbie" and the "North End Barbie" were racist and stereotypical of minorities. He also thought that the "Riverton Barbie" had racial overtones that were stereotypical of certain segments of the Caucasian population. Nelson had known Hanners for several years prior to the e-mail and Nelson did not believe Hanners was a racist, but believed the e-mail showed poor judgment.

Woods believed discipline was appropriate because the offensive e-mail was determined to have been initiated by Hanners through ISP equipment and ISP electronic mail. Woods also believed there was a need to deter that type of conduct in the future.

---

[6]The job "Coordinator" was the highest position in the EEO.

## THE DISCIPLINARY REVIEW BOARD

The Disciplinary Review Board ("DRB") consists of all of Deputy Directors, or their designees if they cannot attend. The purpose of the DRB is for an officer to have an opportunity to lay out the officer's perspective of a potentially disciplinary incident. Deputy Directors then formulate a recommendation on what the appropriate discipline is going to be. Their recommendation is forwarded to the ISP's Director.

An officer who is under investigation or who has been accused of some type of misconduct can enter into an agreement with the ISP wherein the officer, by taking full responsibility for the alleged misconduct, can negotiate a settlement and obtain a reduced disciplinary penalty. Prior to the DRB hearing, Nelson tried to negotiate a settlement with Hanners for a suspension of 10-15 days—the same suspension he was negotiating with the other two commanders who were being investigated for similar offenses. While the other individuals took the settlement and agreed to a resolution, Hanners would not agree to a resolution. Thus, the matter went before the DRB. Hanners availed himself of the opportunity to present his view of the e-mail incident by reading a prepared statement.

All Deputy Directors who were in attendance at Hanners' DRB session

recommended he receive a 30-day suspension. Woods was not present when Hanners appeared before the DRB and Adams was only present as an observer. Adams did not make any determination about Hanners' discipline. Trent's role in Hanners' discipline consisted of a conversation with someone after the DRB recommended a 30-day suspension. Trent's impression was that the DRB believed Hanners thought he had not done anything wrong and had shown no remorse. Trent does not recall relying on input other than that of the DRB in making his decision agreeing with the 30-day suspension. Trent typically accepted the DRB's recommendation and did so with respect to the 30-day suspension the DRB recommended for Hanners.

## THE RATINGS SESSION AND PROMOTIONS

The ISP's ratings process involves sworn employees making their intentions known that they want to be involved in the promotional process. Employees agree to take the promotional examination and they are evaluated on job performance. There is a separate rating for job performance and a separate promotional rating. The process involves a written exam and an assessment exercise, which is a practical application of situations to help evaluate the potential candidate. There is also a ratings

session.

Following the written exam and ratings session, a Merit Board assigns candidates a final score. Promotions are based upon eligibility based upon those scores. Assessments are not done by ISP personnel; rather, they are performed by other law enforcement agencies.

The ratings process includes several different dimensions and the candidate is evaluated and given a score from one to nine on each dimension. Although other supervisors are offered the opportunity to give input into a candidate's score, the candidate's supervisor ultimately grades the candidate.

Hanners' supervisor was Anderson-Martin and she served as Hanners' rater during a 2008 rating session. Prior to that session, Anderson-Martin was unsure whether she had to take the situation with the e-mail into account when proposing scores for Hanners. The rating session was facilitated by Lt. Col. Dee Diamond ("Diamond"). Anderson-Martin spoke with Diamond about whether Hanners' e-mail should be taken into consideration for purposes of grading. Diamond had DII's Bill Sheridan speak with Anderson-Martin who told Anderson-Martin to take the e-mail into account. The e-mail's content was not discussed; rather, Hanners'

judgment came up possibly in a category of decisionmaking.

Anderson-Martin assigned Hanners an aggregate grade of 68 (comprised of a 9 for oral communication; 7 for listening; 7 for written communication; 7 for problem solving; 8 for decisionmaking; 7 for planning and organization; 7 for leadership; 8 for efficiency under stress; and 8 for organizational commitment). Woods opined the grade was too high. He offered input as to whether or not the grade was appropriate given the e-mail incident.

Anderson-Martin complained about the group going back to categories for Hanners that had already been discussed, and Commander Kim Cochran ("Cochran") said they could go back. Cochran pointed out that the action of sending the e-mail, in some categories, would lower the score into the "needs improvement" area, but Anderson-Martin refused to lower Hanners' grade that much. Anderson-Martin felt that her defense of her grading decision became adversarial and the situation was made more difficult because she was going to be testing for a captaincy. Despite this "very difficult situation", Anderson-Martin voluntarily reduced Hanners' grade to reflect the e-mail incident. She reduced his aggregate grade to 54 (the 14 point reduction came by lowering Hanners' decisionmaking score from 8 to

3; his leadership from 7 to 3; and his organizational commitment from 8 to 3).[7]

Trent had no involvement in the promotional ratings process. Nelson did not play any role either. Nelson only heard about what happened at the ratings session after the fact.[8]

## HANNERS' GRADING CHALLENGE

After receiving his grade, Hanners challenged it. As a superior in Hanners' chain of command, Woods reviewed the challenge, the scores, the documents to support the scores and Hanners' perspective of the scores. Woods then made his recommendation. Fidler, Anderson-Martin and Stallworth also considered Hanners' challenge and reviewed the documents. Anderson-Martin was tasked with writing a responsive memorandum. Prior to writing it, Stallworth told her that Hanners' grade would not be changed. Anderson-Martin created three drafts of the memorandum. Each was rejected and she was told to "water it down". Ultimately, a memorandum emerged wherein Fidler, Stallworth and Anderson-Martin unanimously

---

[7]The graders discussed other candidates' grades and lowered their grades for various reasons as well. However, no details are provided in that regard.

[8]There is no evidence concerning whether any other sender or recipient of the Barbie Doll e-mail sought promotion. Additionally, there is no evidence that any person who was disciplined for any other misconduct sought promotion.

agreed that Hanners' challenge should be rejected.

Nelson did not provide any guidance or have any input in the discussion after the rating session about whether the e-mail incident should have been considered. Nelson did not know that any of Hanners' ratings had been lowered as a result of the ratings session. Trent had no involvement in resolving Hanners' grading challenge.

## THE LAWSUIT

Unhappy with his suspension and his grade during the promotion process, Hanners filed the instant lawsuit. He alleges that he was suspended and graded unfairly because of his political views and his race (Caucasian). Hanners' political views form the basis of a First Amendment claim he brings under 42 U.S.C. § 1983. His race discrimination claims are based on § 1983 and 42 U.S.C. § 1981. Defendants Trent, Nelson, Adams, Woods and Stallworth (collectively "the Defendants") have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). They have filed a Memorandum of Applicable Law and Argument in Support of Defendants' Motion for Summary Judgment ("Defendants' Brief") (d/e 22). Hanners has responded and the Defendants have replied. See d/e 27 and 37, respectively. Having considered the relevant facts and law, the Court

now rules.

## JURISDICTION & VENUE

This Court has subject matter jurisdiction because Hanners' claims are based on federal statutes. <u>See</u> 28 U.S.C. § 1331. Personal jurisdiction exists because the Defendants' actions took place in Illinois. <u>See World-Wide Volkswagen Corp. v. Woodson</u>, 444 U.S. 286, 297 (1980) (personal jurisdiction exists where a defendant "'purposefully avail[ed] itself of the privilege of conducting activities'" in the forum state)(quoting <u>Hanson v. Denckla</u>, 357 U.S. 235, 253 (1958)). Venue exists because a substantial part of the events giving rise to Hanners' claims occurred in this judicial district. <u>See</u> 28 U.S.C. §1391(a)(2).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>see</u> <u>also</u>, Fed.R.Civ.P. 56(c). A moving party must show that no reasonable fact-finder could return a verdict for the non-moving party. <u>See Anderson v. Liberty Lobby,</u>

Inc., 477 U.S. 242, 254 (1986); Gleason v. Mesirow Fin., Inc., 118 F.3d 1134, 1139 (7th Cir. 1997).  Facts must be viewed in the light most favorable to the non-moving party and all reasonable inferences must be drawn for the non-movant.  See Trentadue v. Redmon, 619 F.3d 648, 652 (7th Cir. 2010).

ANALYSIS

The Court will begin by addressing Hanners' First Amendment claims.  It will then consider the Seventh Amendment issue he raises before moving on to Hanners' race discrimination claims.  Lastly, the Court will address the Defendants' qualified immunity assertion.

## FIRST AMENDMENT CLAIMS

Hanners' Complaint alleged that the Defendants retaliated against him because of his political views and that the retaliation violated his First Amendment rights.  See d/e 1.  The Defendants have moved for summary judgment on Hanners' First Amendment claims.  See d/e 21.

In his Brief, Hanners states that he "agrees that there is insufficient evidence from which a jury could reasonably conclude that his First Amendment rights were violated."  See d/e 27 at 4.  Furthermore, Hanners agrees that he lacks "sufficient evidence that his political views played a

role" in the suspension or ratings decisions.  Id.

Given Hanners' admission that he lacks evidence and that no jury could reasonably find his First Amendment rights were violated, the Defendants are entitled to summary judgment on Hanners' First Amendment claims.  See Mosley v. City of Chicago, 614 F.3d 391, 396 (7th Cir. 2010) (summary judgment is proper when a non-moving party admits that the moving party is entitled to judgment as a matter of law)(citing Fed.R.Civ.P. 56(c).

## SEVENTH AMENDMENT ISSUE

Hanners asserts that summary judgment would violate his Seventh Amendment right to a jury trial.  The Court disagrees.

If a plaintiff's claim is such that the Seventh Amendment allows trial by jury, a plaintiff is entitled to have a jury hear his claim if the claim makes it to trial.  However, if a claim is unable to withstand summary judgment, the plaintiff is not entitled to any trial (much less one by jury).  The Seventh Amendment is not violated in such instances.  See Legg v. Pappas, 383 Fed.Appx. 547 at *2, n.4 (7th Cir. 2010) (it is "frivolous" to contend that "existing summary judgment law violates the Seventh Amendment"), citing In re Peterson, 253 U.S. 300, 310 (1920); Burks v. Wisconsin Dept.

of Transportation, 464 F.3d 744, 759 (7th Cir. 2006).

## § 1983 AND § 1981 DISCRIMINATION CLAIMS

The Fourteenth Amendment's Equal Protection Clause grants all Americans "the right to be free from invidious discrimination in statutory classifications and other governmental activity." Harris v. McRae, 448 U.S. 297, 322, 100 S.Ct. 2671, 2691, 65 L.Ed.2d 784 (1980). A violation of this constitutional right allows an aggrieved party to seek redress pursuant to 42 U.S.C. § 1983. See Nabozny v. Podlesny, 92 F.3d 446, 453 (7th Cir. 1996). Discrimination against an individual due to the individual's race gives rise to redress pursuant to 42 U.S.C. § 1981. See Humphries v. CBOCS West, Inc., 474 F.3d 387, 398 (7th Cir. 2007). Irrespective of whether a plaintiff asserts a § 1981, § 1983 or a Title VII claim, the same requirements for proving discrimination apply. See Egonmwan v. Cook County Sheriff's Dept., 602 F.3d 845, 850, n.7 (7th Cir. 2010), citing Humphries, 474 F.3d at 403-04 (discussing § 1981 claim) and Davis v. Wis. Dept. of Corrections, 445 F.3d 971, 976 (7th Cir. 2006) (discussing § 1983 claim and Title VII claim).

To survive summary judgment on a race discrimination claim, a plaintiff "must either point to enough evidence, whether direct or

circumstantial, of discriminatory motivation to create a triable issue (the 'direct' method) or establish a prima facie case under the <u>McDonnell Douglas</u> formula (the 'indirect' method)." <u>Egonmwan</u>, 602 F.3d at 849-50.[9] Hanners does not try to establish a race discrimination claim under <u>McDonnell Douglas</u>' indirect evidence formula. Rather, his discrimination claims are based on direct evidence.

To establish a claim under the direct evidence method, a plaintiff "must have provided direct evidence of-or sufficient circumstantial evidence to allow an inference of-intentional racial discrimination by [the defendant]." <u>Montgomery v. American Airlines, Inc.</u>, 626 F.3d 382, 393 (7th Cir. 2010) (quoting <u>Coffman v. Indianapolis Fire Dept.</u>, 578 F.3d 559, 563 (7th Cir. 2009)). Direct evidence consists of either an "outright admission by the decisionmaker that the challenged action was undertaken because of the appellant's race" or a "convincing mosaic of circumstantial

_____

[9]The "McDonnell Douglas formula" refers to the analysis derived from <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). That analysis requires a plaintiff to prove that: (1) he is a member of a protected class; (2) his job performance met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated individual outside his protected class was treated more favorably. <u>See</u> <u>Burks</u>, 464 F.3d at 750-51. After making this showing, if the defendants counter with legitimate, nondiscriminatory reasons for their actions, a plaintiff would also have to show that those reasons were pretextual. <u>Id.</u> at 751.

evidence . . . that point[s] directly to a discriminatory reason for the employer's action." Davis v. Con-Way Transp. Central Express, Inc., 368 F.3d 776, 783 (7th Cir. 2004) (internal quotations and citations omitted).

Hanners offers no admissions of discrimination and relies, instead, on circumstantial evidence.  In Montgomery, the Seventh Circuit explained that "[t]he relevant circumstantial evidence in discrimination cases ordinarily consists of indicators showing what may be 'the real motivating force for employment decisions.'" Montgomery, 626 F.3d at 393, citing Coffman, 578 F.3d at 563.  There are two general categories of circumstantial evidence: (1) ambiguous statements or behavior toward other employees in the protected group that taken together allow an inference of discriminatory intent and (2) evidence of systemically better treatment of employees outside the protected class." Montgomery, 626 F.3d at 393, quoting Coffman, 578 F.3d at 563.[10]

---

[10]With regard to evidence of discrimination, Hanners contends that he need only show that race was a "motivating factor" that led to his suspension and job performance grade.  See Hanners' Brief at 68, citing Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 287 97 S.Ct. 568 (1977).  The Mt. Healthy "motivating factor" criterion was abrogated by Gross v. FBL Financial Services, Inc., __ U.S. __, 129 S.Ct. 2343, 2352, n.6 (2009) (holding that under the plain language of the ADEA, an employee bringing a disparate treatment claim must prove by a preponderance of the evidence that age was the "but-for" cause behind the employer's adverse decision, and not merely one of the motivating factors).  The Seventh Circuit subsequently determined that Gross changed plaintiffs' burden of proof on causation in § 1983 cases

Hanners was given a 30-day suspension for violating personnel Rule PER-32 in that he: (1) misused department equipment by sending an inappropriate e-mail; and (2) engaged in conduct that was offensive for reasons of race, sexual orientation and gender. Hanners makes no attempt to compare his suspension to the suspensions imposed on Kinter (nee Connor), Rolape or Beagles—the ISP employees who forwarded the Barbie Doll e-mail. Instead of comparing his suspension to these similarly situated persons, Hanners compares his suspension to the suspensions of 18 other disciplined employees.

According to Hanners, a comparison between himself and the 18 persons on his list shows that they received less punishment despite similar or worse misconduct than his own. See Hanners' Brief at 73-74. The 18 employees' misconduct and their discipline is as follows: promising to let a speeding motorist go if she showed her underwear (10-day suspension); watching pornographic videos while on patrol (3-day suspension); threatening to "kick [a coworker's] ass" (counseling); using excessive force during an arrest (letter of reprimand); sending an e-mail that included an

---

from the standard announced in Mt. Healthy to a "but-for" standard. See Waters v. City of Chicago, 580 F.3d 575, 584 (7th Cir. 2009); Fairley v. Andrews, 578 F.3d 518, 525-26 (7th Cir. 2009); Gunville v. Walker, 583 F.3d 979, 984, n.1 (7th Cir. 2009).

"'F-word' video" (oral reprimand); failure to make an employee serve a disciplinary term (1-day suspension); cheating during a promotional exam (written reprimand); causing a domestic disturbance (7-day suspension); storing pornography on a computer (2-day suspension); threatening to kill own wife (letter of reprimand); bar fight while off duty (2-day suspension); verbal abuse of own wife and false statements (8-day suspension); theft (letter of reprimand and mandatory restitution); falsely "calling in sick" (4-day suspension); calling other law enforcement officers "pricks" and refusing to allow girlfriend to leave premises (8-day suspension); and losing 6 grams of heroin (1-day suspension). See Hanners' Brief at 73-74.

At most, Hanners' list contains 3 instances of misused ISP equipment (*i.e.* the 2 pornography incidents and the one incident involving the "'F-word' video").[11] The list contains no instances of conduct offensive for reasons of race, sexual orientation or gender. Most importantly, there is no indication that anyone on the list is non-Caucasian. Thus, Hanners' list provides no evidence that employees outside the protected class (*i.e.* non-Caucasians) received systematically better treatment than Caucasians such

---

[11]The Court says "at most" because it is unclear from Hanners' Brief whether the computer used to watch pornography was an ISP issued computer or the patrolman's own computer. See Hanners' Brief at 73.

as Hanners.  See Montgomery, 626 F.3d at 393.

Since Hanners' list of disciplined employees is not probative of racial animus, he can alternatively show discrimination by establishing "ambiguous statements or behavior toward other employees in the protected group that taken together allow an inference of discriminatory intent".  Id.  Hanners offers no such evidence.  Instead, Hanners tries to create an inference of discriminatory intent by asserting that: the e-mail would not have been problematic if he were an African-American; irregularities in the investigation of the e-mail incident; and Hanners' supervisor was pressured to reduce Hanners' grade when assessing his job performance.  See Hanners' Brief at 70-74.  None of these creates a "convincing mosaic of circumstantial evidence . . . that point[s] directly to a discriminatory reason for the employer's action."  Davis, 368 F.3d at 783.          1.      The E-mail

Hanners' assertion that the e-mail would not have been problematic if he were African-American does not merit much discussion.[12]  As explained above, Hanners failed to provide any examples of non-Caucasians who sent

_____

[12]Since Hanners devoted only two sentences to this argument, it seems he did not think it deserved much discussion either.  He merely says: "A reasonable jury could permissibly conclude that if Hanners were African American his e-mail would not have been considered problematic and he would not have been disciplined.  This is clear based upon the response of three African Americans: Nelson, Stallworth and Woods."  See Hanners' Brief at 70.

e-mail similar to Hanners' and received discipline less than Hanners' 30-day suspension.[13]

Absent such an example, Hanners' assertion is mere speculation. Speculation is insufficient to withstand summary judgment.  <u>Karazanos v. Navistar Intern. Transp. Corp.</u>, 948 F.2d 332, 337 (7th Cir. 1991) ("[A] plaintiff's speculation is not a sufficient defense to a summary judgment motion.").

2.   <u>Investigation of the E-mail Incident</u>

In <u>Giacoletto v. Amax Zinc Co.</u>, 954 F.2d 424, 427 (7th Cir. 1992), the Seventh Circuit stated that an employer's failure to follow policies designed to help employees overcome their deficiencies can show that the employer did not truly believe the employee had any deficiencies; thus, the employer's asserted reason for an adverse employment action (*i.e.* termination because of deficient job performance) might be pretextual. Hanners uses <u>Giacoletto</u> and similar cases to contend that an employer's departure from its own internal policies is circumstantial evidence of

---

[13]Hanners' 30-day suspension could have been shortened to 10-15 days if he had accepted the ISP's proposed settlement.  Nelson had negotiated 10 to 15-day suspensions with 2 commanders who were investigated for offenses similar to Hanners'. Since neither Hanners nor the Defendants indicate the race of the aforementioned commanders, there is no evidence to suggest that race was a factor in the other suspensions.

discrimination.  <u>See</u> <u>Hanners' Brief</u> at 70, <u>citing</u>, <u>Giacoletto</u>, 954 F.2d 424,

<u>Rudin v. Lincoln Land Community College</u>, 420 F.3d 712, 713 (7th Cir.

2005) (additional citations omitted).

As an initial matter, it should be observed that cases such as <u>Rudin</u>

require more than a deviation from an employer's internal policy to

withstand summary judgment.  In <u>Rudin</u>, the Seventh Circuit found that

sufficient circumstantial evidence to withstand summary judgment existed

when a Caucasian plaintiff showed that an employer deviated from its

customary hiring practices to hire a black job candidate who ranked second-

lowest of all applicants; the candidate had been reinserted into the

candidate pool after previously being eliminated from contention; and the

candidate's reinsertion followed a committee chairperson's repeated

statements about being under pressure to hire a minority candidate.  <u>Rudin</u>

420 F.3d at 722-24.

Unable to allege facts on par with <u>Rudin</u>, Hanners argues a deviation

from ISP policy PER-032 during the investigation of the e-mail incident is

evidence of discrimination.  <u>See</u> <u>Hanners' Brief</u> at 70.  ISP policy PER-032

states that:

Whenever an employee, supervisor, or manager reports

> allegations of discrimination, harassment or retaliation to the [ISP's] EEO Office, the EEO Office will send the employee reporting such discrimination, harassment, or retaliation an EEO Complaint Intake Questionnaire, form ISP 1-36, within 5 calendar days of receiving the report.

See Hanners' Brief at 71 (citing Defendants' Brief at Exhibit 6A, PER-032, § III.B.1).

Hanners contends that a deviation from ISP policy PER-032 is apparent because there was no complainant and no one ever completed the intake form. See Hanners' Brief at 71. However, the undisputed facts show that there are two ways the e-mail investigation could have been initiated. An employee could file a complaint and the EEO would send the complainant the appropriate intake form. Alternatively, a supervisor could file a complaint based on a possible EEO violation. If a supervisor was the complainant, a signed CADM would be filed with the DII or senior command personnel could write a memorandum to the chief of the EEO requesting an investigation.

While none of Hanners' coworkers ever filed a complaint, Hanners admits that Fidler (a supervisor) submitted a CADM. Id. at 11-12, 41. DII referred the matter to Fidler, asking him to determine whether the e-mail originated with Hanners. Fidler asked Anderson-Martin, Hanners'

supervisor, to investigate and she complied with that request. Anderson-Martin interviewed individuals who received the e-mail and wrote reports about her findings. Upon concluding that the e-mail originated from Hanners, Fidler submitted a CADM indicating that fact. As such, the investigation was initiated in accordance with ISP policy. While no Complaint Intake Questionnaire was ever completed, that deviation is immaterial given the submission of Fidler's CADM.

Hanners also argues that DII's assigning the investigation of the e-mail matter to Fidler and Anderson-Martin and then withdrawing the investigation from them creates an inference of discrimination. In Hanners' view, investigatory duties were withdrawn from Fidler and Anderson-Martin because they were not going to impose sufficient discipline.

The facts do not bear out Hanners' speculation. Rather, the facts show that DII initiated the investigation and referred it to Fidler for the limited purpose of verifying that the e-mail originated with Hanners. Once Fidler verified the e-mail's origin, something he did with Anderson-Martin's assistance, Fidler submitted a CADM to DII. The referral to Fidler was, thus, complete and DII resumed the investigation. This unremarkable chain of events does not show that the e-mail investigation was tainted by racial

animus.

3. <u>Hanners' Job Performance Grade</u>

Hanners contends that the e-mail incident was wrongly used to impact his superior Anderson-Martin's grading of his job performance during the 2008 ratings and promotions period. <u>See</u> <u>Hanners' Brief</u> at 72. The facts do not support Hanners' contention.

The facts show that the e-mail incident was under investigation when Anderson-Martin was asked to grade Hanners' job performance. Anderson-Martin was uncertain whether the e-mail incident should be considered for purposes of grading Hanners' job performance. She addressed the issue with her supervisor, Diamond. Diamond contacted DII's Bill Sheridan, and Bill Sheridan told Anderson-Martin that the e-mail was relevant to the grading of Hanners' job performance.

After Anderson-Martin determined Hanners' grade, Woods asked her if she took the e-mail incident into consideration. Anderson-Martin explained that because the incident was still under investigation, she believed it should be omitted as a grading factor. Woods stated that because the e-mail occurred during the promotion process, it had to be considered.

Since Anderson-Martin was the decisionmaker who graded Hanners' job performance, her's is the relevant conduct with respect to Hanners' discrimination claim. See Venturelli v. ARC Community Services, Inc., 350 F.3d 592, 600 (7th Cir. 2003). While Anderson-Martin felt pressure to reduce Hanners' job performance to reflect the e-mail incident, there is no evidence that she was ordered to lower Hanners' grade. When Anderson-Martin reduced Hanners' grade due to his admittedly wrongful use of an ISP computer for personal purposes, she did so voluntarily. Since Hanners offers nothing to suggest Anderson-Martin's grading was affected by another employee's concealment of relevant information, or that she was fed false information, there is no evidence that the grading process was impermissibly influenced. Cf. Conn v. GATX Terminals Corp., 18 F.3d 417, 420 (7th Cir. 1994) (information concealed from decisionmaker undermines validity of decisionmaker's assessment); Willis v. Marion County Auditor's Office, 118 F.3d 542, 547 (7th Cir. 1997) (judgment for defendant as a matter of law affirmed where plaintiff did not present evidence that the biased employees were "able to manipulate the decisionmaking process and to influence the decision"). Moreover, the ratings process allowed Hanners to challenge his grade and he did so. After the challenge was made, Woods reviewed

Hanners' grade and recommended against adjusting it. Woods' recommendation was considered by Fidler, Anderson-Martin and Stallworth and the three unanimously decided not to adjust Hanners' grade. This is significant because neither Fidler nor Anderson-Martin are alleged to have discriminatory animus yet they too decided that Hanners' grade was correct and rejected his challenge. Thus, Hanners would have received the same grade regardless of the Defendants' alleged animus. See Alexander v. bioMerieux, Inc., 270 Fed.Appx., 422, 425 (7th Cir. 2008), citing Fanslow v. Chicago Mfg. Ctr., Inc., 384 F.3d 469, 485 (7th Cir. 2004); Cf. Merheb v. Ill. State Toll Highway Auth., 267 F.3d 710, 714 (7th Cir. 2001) (even if defendants harbored animus they are entitled to summary judgment if no reasonable jury could infer that plaintiff would not have suffered an adverse employment action but-for that animus). For this and the other reasons stated above, Hanners is unable to establish a prima facie case of discrimination.

## QUALIFIED IMMUNITY

Because Hanners cannot establish a prima facie case of discrimination, the Defendants are entitled to summary judgment. Thus, the Court need

not consider whether the Defendants are entitled to qualified immunity.

<u>CONCLUSION</u>

THEREFORE, the Defendants' Motion for Summary Judgment (d/e 21) is ALLOWED.  Plaintiff Flynn Hanners' claims against Defendants Larry Trent, Harold Nelson, Lance Adams, Rich Woods and Leonard Stallworth are DISMISSED WITH PREJUDICE.  This case is CLOSED.

ENTERED this 28th day of February, 2011

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE